UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

JOZEF KLAPER

                Plaintiff,

      -against-

CYPRESS HILLS CEMETERY and UNITED
SERVICE WORKERS UNION LOCAL 74

             Defendants.

-------------------------------------------------------------------X

NICHOLAS G. GARAUFIS, United States District Judge.

**MEMORANDUM & ORDER**

**10-CV-1811 (NGG) (LB)**

**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y.

★ MAR 2 1 2012 ★

**BROOKLYN OFFICE**

Plaintiff Jozef Klaper brings this action against his former employer, Defendant Cypress

Hills Cemetery (the "Cemetery"), and his former labor union, Defendant United Service Workers

Union Local 74 ("Local 74"). He alleges that Defendants discriminated against him on the basis

of his age, Polish national origin, and disability of alcoholism. Klaper brings claims pursuant to

Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq. ("Title VII"); the Age Discrimination

in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA"); the Americans with Disabilities Act, 42

U.S.C. § 12101 et seq. ("ADA"); 42 U.S.C. § 1985; the New York State Human Rights Law,

N.Y. Exec. Law § 290 et seq. ("NYSHRL"); the New York City Human Rights Law § 8-107 et

seq. ("NYCHRL"); and state common law causes of action. Klaper moves to amend his

Complaint pursuant to Federal Rule of Civil Procedure 15(a); the Cemetery consents to that

amendment but Local 74 opposes it. Local 74 also moves to dismiss the claims against it

pursuant to Federal Rule of Civil Procedure 12(b)(6).

For the reasons set forth below, Klaper's motion to amend his Complaint is GRANTED

but Local 74's motion to dismiss the claims against it is also GRANTED. Klaper fails to state a

claim against Local 74 under Title VII and the ADA because he has not sufficiently alleged that

Local 74 breached its duty of fair representation; he fails to state an ADEA claim against Local 74 because he seeks only monetary damages; he fails to state a 42 U.S.C. § 1985 claim against Local 74 because his allegations of employment discrimination cannot form the basis of such a claim; and the court lacks subject matter jurisdiction over his NYSHRL and NYCHRL claims against Local 74 because he has already brought the claims before the New York State Division of Human Rights. Accordingly, Klaper's claims against Local 74 are dismissed and this case will proceed solely against the Cemetery.

## I.   BACKGROUND

### A.   Facts[1]

Plaintiff Jozef Klaper is a man of Polish descent who was sixty-two years old at the time he filed his Complaint. (Compl. (Docket Entry # 1) at 4.) Klaper was employed by the Cemetery as a tractor driver and maintenance worker from May 9, 2005, until his termination on July 2, 2008. (Am. Compl. (Docket Entry # 36-2) ¶¶ 15, 17-18, 93.) Klaper claims that he was paid $18 per hour while other workers were paid $25 per hour for performing the same duties. (Compl. at 4.) After ninety days of employment at the Cemetery, Klaper became a member of Defendant Local 74, a labor organization charged with the representation of the Cemetery's field workers. (Am. Compl. ¶ 7.)

Klaper alleges that, from the time he began working at the Cemetery, he faced daily discriminatory conduct from Cemetery employees. Among other things, Klaper alleges: (1) that his foreman and direct supervisor, John Nicastro, and the Supervisor of Field Operations, Anthony Russo, called him "Eddie Mouser"—the name of an older former Cemetery worker who had passed away—for the purpose of mocking Klaper's age (id. ¶¶ 22-35); (2) that after he

---

[1]      For the purposes of ruling on Local 74's motion to dismiss, the court accepts as true the factual allegations in the Complaint and proposed Amended Complaint. See Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009).

complained to Russo about the "Eddie Mouser" comments, he "was singled out for more difficult and more laborious chores" (id. ¶ 36); (3) that Nicastro called him "stary chuj," a Polish term that means "old dick" or "old cock" (id. ¶¶ 38-43, 52); (4) that he was not permitted to sit in the front seat of the car when he was driven to different work sites at the Cemetery (id. ¶ 43); and (5) that the Cemetery deliberately teamed Klaper and Nicastro together, knowing of Nicastro's harassing conduct toward Klaper, in order to "create and fabricate a reason for [Klaper's] termination" and for the purpose of harassing and antagonizing him (id. ¶ 49-50).

According to Klaper, "as a result of [the] constant mental abuse by Mr. Nicastro and other Cemetery workers, [Klaper] fell into depression and was drinking at home." (Id. ¶ 54.) On June 27, 2008, he "finally stood up for himself" and "told Mr. Nicastro off." (Id. ¶ 56.) That weekend, "depressed over his treatment at work," Klaper "went on a drinking streak," and left a message with Russo's secretary the following Monday "stating that he was very sick and that he would return to work on Wednesday, July 2, 2008." (Id. ¶¶ 57-58.) When Klaper returned to work that Wednesday, he was told that his employment was terminated. (Id. ¶ 60.) He was never given a termination letter or a reason for his termination. (Id.)

About one week later, another employee of the Cemetery gave Klaper the phone number of a Polish-speaking employee of Local 74, Anna Kubas. (Id. ¶ 63.) Klaper called Kubas to ask for help from Local 74, after which he visited Local 74's office at least three times to meet with Kubas and Local 74's Contract Administrator, Mike Herron. (Id. ¶ 64.) Local 74 then arranged a meeting between Klaper, Local 74, and the Cemetery, to take place on August 2, 2008. (Id. ¶ 66.)

The meeting was attended by Klaper, Mario Gil—the Cemetery's Vice President—

Russo, Herron, and Kubas. (Id. ¶¶ 67.) Klaper was presented with a "final chance stipulation"

("Stipulation"). The full text of the Stipulation is as follows:

> I, Jozef Klaper, with the advice of my union representative, agree to the following
> stipulation's [sic] relating to the complaint filed on 7/02/2008 by my
> Superintendent, Anthony Russo.
>
>> 1.) Jozef will be suspended for three months with a scheduled
>> return to work date of October 1st, 2008. Cypress Hills Cemetery
>> will continue paying for his benefits during the three month period
>> of suspension.
>> 2.) Jozef will lose seniority and go to the bottom of the seniority
>> list.
>> 3.) Jozef will enter an Alcohol Rehabilitation Program, during his
>> suspension, and show proof of successfully completing the
>> Alcohol Rehabilitation Program.
>> 4.) Jozef agrees to release his records, to Cypress Hills Cemetery,
>> upon approved release from the Alcohol Rehabilitation Program.
>> 5.) This is a final chance stipulation (subject to termination
>> following any new occurrence in the violation of our rules and
>> regulations).[2]

(Stipulation (Mele Decl., Ex. A (Docket Entry # 42-2)).)

Klaper was told that he was required to sign the Stipulation in order to keep his job at the

Cemetery. (Am. Compl. ¶¶ 68-69.) According to Klaper, Kubas told him that he had "to check

himself into an alcohol rehabilitation program and that after a three (3) months suspension he

would return to work," but never translated the Stipulation to Klaper, never informed him "that

by signing the document he was agreeing to give up his seniority," and never informed him that

it was a "final chance stipulation." (Id. ¶¶ 69-70.) Klaper signed the Stipulation but claims that

he did not fully understand it. (Id. ¶ 71; Compl. at 4.)

---

[2]      The court may consider the Stipulation in ruling on this motion to dismiss because it is incorporated by
reference in the Amended Complaint (see Am. Compl. ¶¶ 68-71) and is integral to Klaper's claims against Local 74.
See Holmes v. Air Line Pilots Ass'n, 745 F. Supp. 2d 176, 193 (E.D.N.Y. 2010) (citing Sira v. Morton, 380 F.3d 57,
67 (2d Cir. 2004)).  Klaper does not dispute the authenticity of the Stipulation.

4

On August 4, 2008, Klaper checked himself into an alcohol dependence/abuse program at St. Mark's Place Institute for Mental Health, Inc. ("St. Mark's"); he remained there until September 4, during which time he retained sobriety. (Am. Compl. ¶¶ 73-74.) But he relapsed on September 26, was hospitalized, and underwent a five-day detoxification. (Id. ¶¶ 77-78.) Klaper was discharged from the hospital on October 1, and returned to St. Mark's on October 2, 2008. (Id. ¶¶ 79-80.) Although the Stipulation provided that Klaper would return to work on October 1, Klaper did not do so, and does not allege that he informed the Cemetery or Local 74 that he would not be returning on that date.

On October 2, 2008, Klaper was informed by his psychotherapist, George Wawrzonek, that "he was not ready to return to work and that he needed further psychiatric support and counseling." (Id. ¶ 81.) On October 3, Wawrzonek called Russo at the Cemetery and left a message about Klaper's "continuing inpatient treatment and proposed reasonable accommodations for his return to work." (Id. ¶ 82.) Russo did not respond to that message or to a second message Wawrzonek left the following week. (Id. ¶¶ 83-84.) On October 6, Dr. Roman Pabis, the Director of St. Mark's, sent a fax to both the Cemetery and Local 74— addressed to the attention of Russo—discussing the seriousness of Klaper's illness, proposing that Klaper take medication to prevent him from drinking, and noting that Klaper had been paying the costs of his alcohol rehabilitation program out of pocket.[3] (Id. ¶¶ 85-87, Ex. C.) Neither the Cemetery nor Local 74 responded. (Id. ¶ 88.)

On October 9, 2008, Klaper returned to work, but Russo told him he was fired. (Id. ¶ 93.) Klaper claims, on information and belief, that he was replaced with a "younger, non-Polish and non-disabled worker." (Id. ¶ 94.) Local 74 was informed of his termination but

---

[3]     The court may consider Dr. Pabis's fax because it is attached to the Amended Complaint. See Leonard F. v. Israel Discount Bank of N.Y., 199 F.3d 99, 107 (2d Cir. 1999).

did not object to the termination decision. (Id. ¶¶ 95-96.) Following Klaper's termination, Dr. Pabis called Herron at Local 74 and left at least two messages requesting that Local 74 help Klaper get his job back, but received no response. (Id. ¶¶ 100-01.) Klaper then went to Local 74's office "on at least three occasions" and "pleaded for his job back" with Herron and Kubas, but Local 74's representatives told Klaper "that nothing could be done and refused to file a grievance on his behalf." (Id. ¶¶ 102-05.) Klaper told Herron about "the discriminatory conduct and harassment he had been subjected to while he was working at the Cemetery," including being called "Eddie Mouser" and "stary chuj," and Herron responded that "everyone has some kind of nickname." (Id. ¶ 106-07.) Klaper alleges that "Herron's statement regarding [Klaper's] 'nickname' reflects his own prejudice against older Polish Plaintiff." (Id. ¶¶ 108-09.)

### B. Procedural History

On November 3, 2008, Klaper filed a discrimination charge against the Cemetery and Local 74[4] with the New York State Division of Human Rights ("NYSDHR"), which was jointly filed with the United States Equal Employment Opportunity Commission ("EEOC"). (Am. Compl. ¶¶ 8, 10.) The charge alleged that the Cemetery and Local 74 discriminated against Klaper on the basis of age, disability, and national origin. (Am. Compl. ¶ 8; Pl. Charge of Discrimination (Piotrowski Decl. (Docket Entry # 41-1), Ex. 1).) On February 22, 2010, the NYSDHR determined that there was no probable cause to support Klaper's discrimination claims and dismissed his complaint. (Final Investigation Report and Basis of Determination (Piotrowski Decl., Ex. 2); Determination and Order after Investigation (Piotrowski Decl., Ex. 3).)

---

[4]     As Magistrate Judge Lois Bloom explains in her Report and Recommendation ("R&R"), the parties disagree as to whether Local 74 was a respondent to the charge. (R&R (Docket Entry # 47) at 4-5, 10-14.) Because the court does not reach the issue of whether Klaper exhausted his administrative remedies (see infra n.7), the court will not discuss the details of Klaper's discrimination charge and the resulting investigation.

The EEOC adopted that determination and issued Klaper a right-to-sue letter on July 15, 2010. (Am. Compl., Ex. A (Docket Entry # 36-2) at 31.)

According to the documents submitted by the Cemetery to the NYSDHR, Klaper was provided with "Employee Warning Slips" on June 26 and 27, 2008. (Id. ¶ 116.) The June 27 warning slip states that Klaper had been observed carrying a handgun and saying that he was on his way to murder Nicastro. (Id. ¶ 117.) Klaper alleges that the statements in the warning slips are untrue, that he did not know about the slips until they were produced to the NYSDHR, and that the Cemetery "fabricated both warning slips" as part of a conspiracy with Local 74 "to terminate [Klaper] and replace him with [a] younger, non-Polish and non-disabled worker." (Id. ¶¶ 118, 120, 122, 124.)

On April 20, 2010, Klaper filed his original pro se Complaint in this action. (Compl.) Klaper alleges that Defendants discriminated against him on the basis of his age, Polish national origin, and disability of alcoholism, and brings claims pursuant to Title VII, the ADEA, the ADA, 42 U.S.C § 1985, the NYSHRL, the NYCHRL, and (against the Cemetery only) state common law causes of action.[5] (Id. at 1; Am. Compl.) He seeks damages for loss of wages and benefits, damages "for mental anguish, extreme emotional distress, humiliation and embarrassment," punitive damages, and attorney's fees and costs. (Am. Compl. at 28-29.) The Cemetery filed an Answer on July 2, 2010. (Docket Entry # 13.) On August 13, 2010, Local 74 filed a motion to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Docket Entry # 15.)

Klaper subsequently retained an attorney, Tomasz Piotrowski, who filed a notice of appearance on September 17, 2010. (Docket Entry # 22.) Piotrowski requested permission to

---

[5] Klaper's pro se complaint states that "[j]urisdiction may also be appropriate under 42 U.S.C. §§ 1981 [and] 1983." (Compl. at 2.) Because Klaper does not raise any such claims in his Amended Complaint and has not articulated the substantive basis of the claims, the court does not address them.

file separate proposed amended complaints against the Cemetery and Local 74. (Docket Entry ## 26, 28-32.) At an October 26, 2010, status conference, Magistrate Judge Lois Bloom ordered Klaper to submit a single proposed amended complaint and Local 74 withdrew its pending motion to dismiss without prejudice. (See Order of Oct. 26, 2010.)

Klaper filed a motion to amend his Complaint on November 3, 2010, pursuant to Federal Rule of Civil Procedure 15(a), along with supporting documentation. (Docket Entry ## 34-36.) By letter dated December 13, 2010, the Cemetery represented that it did not oppose Klaper's motion to amend. (Docket Entry # 40.) Local 74, however, opposes the proposed Amended Complaint and re-filed its motion to dismiss the Complaint on January 14, 2011. (Mot. to Dismiss (Docket Entry # 42); Mem. in Supp. of Mot. to Dismiss and in Opp'n to Mot. to Am. Compl. (Docket Entry # 43) ("Local 74 MTD Mem.").) Local 74 also filed a reply regarding these issues on that same day. (Docket Entry # 44.)

This court referred both motions to Judge Bloom for a Report and Recommendation ("R&R"), pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b). (Order of Mar. 10, 2011 (Docket Entry # 46).) On August 29, 2011, Judge Bloom issued an R&R recommending that Klaper's motion to amend the Complaint be granted and that Local 74's motion to dismiss the claims against it also be granted. (Docket Entry # 47.)

Klaper filed written objections to the portion of the R&R that recommends dismissal of his claims against Local 74. (Pl. Obj. (Docket Entry # 49).) Local 74 filed an opposition to Klaper's objections but did not object to Judge Bloom's recommendation that the motion to amend be granted. (See Docket Entry # 54.) Klaper replied. (Docket Entry # 55.) The court heard oral argument on the motions on January 27, 2012. (Docket Entry of Jan. 27, 2012.)

8

## II.    STANDARD OF REVIEW

In reviewing the R&R of a dispositive matter from a magistrate judge, the district court "may adopt those portions of the Report to which no objections have been made and which are not facially erroneous." La Torres v. Walker, 216 F. Supp. 2d 157, 159 (S.D.N.Y. 2000); see also Gesualdi v. Mack Excavation & Trailer Serv., Inc., No. 09-CV-2502 (KAM) (JO), 2010 WL 985294, at *1 (E.D.N.Y. Mar. 15, 2010) ("Where no objection to the Report and Recommendation has been filed, the district court need only satisfy itself that there is no clear error on the face of the record." (internal quotation marks omitted)). The district court reviews de novo "those portions of the report . . . to which objection is made." 28 U.S.C. § 636(b)(1).

Under Federal Rule of Civil Procedure 15(a), when more than twenty-one days have passed since the responsive pleadings have been served, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." The court may deny a motion to amend for reasons such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." Ruotolo v. City of New York, 514 F.3d 184, 191 (2d Cir. 2008).

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court evaluates the sufficiency of a complaint under the "two-pronged approach" established by the Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1950 (2009). The court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010) (quoting Iqbal, 129 S. Ct. at 1950). "Threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice" to withstand a motion to dismiss. Iqbal, 129 S. Ct. at 1949. Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." Id. at 1950. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (internal quotation marks omitted). Plausibility "is not akin to a probability requirement," but requires "more than a sheer possibility that a defendant has acted unlawfully." Id. (internal quotation marks omitted).

## III.  DISCUSSION

### A.  Klaper's Motion to Amend the Complaint

Klaper moves to amend his Complaint pursuant to Federal Rule of Civil Procedure 15(a). Local 74 opposes Klaper's motion on the grounds that the proposed amendment would be futile. (Local 74 MTD Mem. at 24-25.) Judge Bloom recommended granting Klaper's motion to amend because the Cemetery "consents to the amendment, and Local 74's motion to dismiss addresses the amended complaint." (R&R at 7.) Because no party has objected to this portion of the R&R, the court reviews it for clear error.[6]  See La Torres, 216 F. Supp. 2d at 159; Gesualdi, 2010 WL 985294, at *1. The court has reviewed the record and Judge Bloom's well-reasoned

---

[6]     The Second Circuit has not yet explicitly decided whether a motion to amend a complaint is dispositive or non-dispositive for the purposes of Federal Rule of Civil Procedure 72. At least some "[d]istrict courts in this circuit have suggested that a magistrate judge's *denial* of a motion to amend a complaint should be treated as dispositive, while a *grant* of the same motion should be treated as non-dispositive." Tyree v. Zenk, No. 05-CV-2998 (KAM) (LB), 2009 WL 1456554, at *3 (E.D.N.Y. May 22, 2009) (collecting cases); see also Baez v. Majuri, No. 10-CV-3038 (BMC) (VVP), 2011 WL 5118442, at *2 (E.D.N.Y. Oct. 27, 2011). But regardless of whether the court construes Klaper's motion to amend as a non-dispositive motion or a dispositive motion to which no party has objected, the standard of review is the same:  Judge Bloom's determination must be reviewed for clear error. See Fed. R. Civ. P. 72(a) (when reviewing a magistrate judge's decision regarding a non-dispositive matter, the district judge must "modify or set aside any part of the order that is clearly erroneous or is contrary to law"); Gesualdi, 2010 WL 985294, at *1 ("Where no objection to the Report and Recommendation has been filed, the district court need only satisfy itself that there is no clear error on the face of the record.").

R&R for clear error and found none. Therefore, the court adopts this portion of the R&R and grants Klaper's motion to amend the Complaint.

### B.    Local 74's Motion to Dismiss

Local 74 moves to dismiss the claims against it pursuant to Federal Rule of Civil Procedure 12(b)(6). The court will first address Klaper's ADEA claim; then his Title VII and ADA claims together; followed by his claims under 42 U.S.C. § 1985; and finally his state law claims. For the reasons set forth below, Klaper's claims against Local 74 are dismissed.

#### 1.    ADEA Claim

Klaper's Amended Complaint alleges that Local 74 discriminated against him on the basis of his age, in violation of the ADEA. (Am. Compl. ¶¶ 192-98.) But as Klaper concedes in his objections to the R&R (see Pl. Obj. at 2 n.1), his Amended Complaint fails to state an ADEA claim against Local 74 because it seeks only monetary damages against the union, and "the ADEA does not permit the recovery of monetary damages against a labor organization." Holmes v. Air Line Pilots Ass'n, Int'l, 745 F. Supp. 2d 176, 204 (E.D.N.Y. 2010) (citing Air Line Pilots Ass'n v. Trans World Airlines, Inc., 713 F.2d 940, 957 (2d Cir. 1983), aff'd in part, rev'd in part, 469 U.S. 111 (1985)). Klaper's ADEA claim against Local 74 is therefore dismissed.

#### 2.    Title VII and ADA Claims

Klaper alleges that Local 74 discriminated against him on the basis of his Polish national origin, in violation of Title VII (Am. Compl. ¶¶ 185-91); and on the basis of his disability of alcoholism, in violation of the ADA (id. ¶¶ 176-84). Local 74 argues that Klaper's Amended Complaint fails to state a Title VII or ADA claim against it because Klaper has not sufficiently alleged that Local 74 breached its duty of fair representation.[7] Since Klaper objected to Judge

---

[7]    Local 74 also makes four additional arguments as to why the court should dismiss the Title VII and ADA claims against it, each of which Judge Bloom declined to reach:  (1) Klaper did not exhaust his administrative

11

Bloom's recommendation that these claims be dismissed, the court reviews the claims de novo. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).

        a.    *Standard for Employment Discrimination Claims against Unions*

Title VII provides that it shall be "an unlawful employment practice" for a "labor organization" to "discriminate against[] any individual because of his . . . national origin." 42 U.S.C. § 2000e-2(c). The ADA prohibits covered entities, including labor organizations, from discriminating in employment against any qualified individual on the basis of disability. Id. §§ 12111(2), 12112.

Employment discrimination claims against labor organizations are analyzed differently from claims against employers. See Oparaji v. United Fed'n of Teachers, 418 F. Supp. 2d 139, 146 (E.D.N.Y. 2006). Claims against labor organizations are grounded in the union's duty of fair representation ("DFR") to its members. See DelCostello v. Teamsters, 462 U.S. 151, 164 (1983). Thus, a plaintiff must make two showings to prevail on a Title VII or ADA claim against a union: (1) "that the union breached its duty of fair representation"; and (2) "that [the union's] actions were motivated by discriminatory animus."[8] McIntyre v. Longwood Cent. Sch.

---

remedies as to Local 74 because Local 74 was not charged in Klaper's NYSDHR claim and therefore was "not afforded [its] procedural right to notice of the charges, did not participate in the [NYSDHR or EEOC] investigation, and was not the subject of the investigation" (Local 74 MTD Mem. at 11); (2) Klaper failed to exhaust as to Local 74 because he "commenc[ed] this action prior to receiving the EEOC right-to-sue letter" (id. at 12); (3) Klaper's claims are time-barred pursuant to the six-month statute of limitations for claims of breach of the duty of fair representation (id. at 13-14); and (4) Klaper failed to allege facts that would qualify his alcoholism as a disability within the meaning of the ADA (id. at 14 n.15). Because the court holds that Klaper fails to state a claim under Title VII and the ADA as a result of his failure to sufficiently allege a breach of the duty of fair representation, the court need not address these issues. The court will assume without deciding that Klaper exhausted his administrative remedies, that he timely filed his claims, and that he sufficiently alleged facts to qualify his alcoholism as a disability under the ADA.

[8]    As will be discussed below, Klaper offers an alternative basis for the union's liability under an "acquiescence" or "ratification" theory, but the court concludes that this theory does not provide a basis for a union's liability independent of the two part-test just discussed. (See Part III.B.2.c, infra.) Moreover, some courts have applied a more stringent three-part test first enunciated by the Seventh Circuit in Bugg v. International Union of Allied Industrial Workers, Local 507, 674 F.2d 595, 599 n.5 (7th Cir. 1982). See generally Ayazi v. United Fed'n of Teachers, Local 2, No. 99-CV-8222 (CLP), 2011 WL 888053, at *12 (E.D.N.Y. Mar. 14, 2011) (citing Parker v. Metro. Transp. Auth., 97 F. Supp. 2d 437, 448 (S.D.N.Y. 2000)). Because neither party urges the court to apply this

Dist., 380 Fed. Appx. 44, 49 (2d Cir. June 4, 2010); see also Jiggetts v. Allied Int'l Union, No. 07-CV-11572 (JSR) (RLE), 2010 WL 2158331, at *3 (S.D.N.Y. Mar. 17, 2010); Ayazi v. United Fed'n of Teachers, Local 2, No. 99-CV-8222 (CLP), 2011 WL 888053, at *10 (E.D.N.Y. Mar. 14, 2011); Oparaji, 418 F. Supp. 2d at 146.

"The duty of fair representation, although not an explicit statutory requirement, has been fashioned judicially as a corollary to '[a union's] statutory authority to represent all members of a [collective bargaining] unit.'" Probst v. Ass'n of Flight Attendants, 546 F. Supp. 2d 14, 20 (E.D.N.Y. 2008) (quoting Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 76 (1991)); see also 29 U.S.C. §§ 158(b), 159(a). In accordance with this duty, a union must "serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." Air Line Pilots, 499 U.S. at 76. The duty applies both to the negotiation and enforcement of the union's collective bargaining agreements. See Vaca v. Sipes, 386 U.S. 171, 177 (1967).

When a plaintiff sues a labor union alleging that the union breached its DFR, the court's review of that alleged breach "must be highly deferential, recognizing the wide latitude that [unions] need for the effective performance of their bargaining responsibilities."[9] Air Line Pilots, 499 U.S. at 78. A union breaches its DFR "only when [its] conduct toward a member of

---

test, and because Klaper's Title VII and ADA claims fail under the more lenient two-part test, the court will apply the two-part test.

[9]    Klaper argues that this court must apply "the test associated with a Rule 12(b)(6) motion to dismiss" rather than the "highly deferential" test associated with DFR claims, which he claims requires the court to "improperly weigh the evidence." (Pl. Obj. at 2-3.) Klaper misunderstands the law. It is true that, in ruling on a Rule 12(b)(6) motion, a court assumes the veracity of well-pleaded factual allegations and determines only whether the plaintiff has stated a plausible claim for relief. See Iqbal, 129 S. Ct. at 1949-50. But the plausibility of a claim depends of course on the legal standard applicable to that claim. Here, the legal standard for Klaper's DFR claim is "highly deferential," Air Line Pilots, 499 U.S. at 78, so the court must determine whether plaintiff's allegations are plausible in light of that deferential standard, see Vaughn v. Air Line Pilots Ass'n, 604 F.3d 703, 709 (2d Cir. 2010) (on appeal of grant of Rule 12(b)(6) motion to dismiss DFR claim, discussing Iqbal's plausibility standard and then noting that its "review of [plaintiff's] allegations is highly deferential" (internal quotation marks omitted)). In other words, there is no contradiction between the court's obligation to apply the standard under Rule 12(b)(6) and its obligation to conduct a deferential review with respect to breaches of the DFR.

the collective bargaining unit is arbitrary, discriminatory, or in bad faith." Vaca, 386 U.S. at

190. "[A] union's actions are arbitrary only if . . . its "behavior is so far outside a wide range of

reasonableness as to be irrational." Air Line Pilots, 499 U.S. at 67 (internal quotation marks and

citation omitted). To establish bad faith, a plaintiff must show that the union's actions constitute

"fraud, deceitful action or dishonest conduct." Henry v. United Parcel Serv., Inc., 602 F. Supp.

2d 419, 423 (E.D.N.Y. 2009) (internal quotation marks omitted).

Thus, although a union "may not arbitrarily ignore a meritorious grievance or process it

in perfunctory fashion," Vaca, 386 U.S. at 191, "the duty of fair representation is not breached

where the union fails to process a meritless grievance, engages in mere negligent conduct, or

fails to process a grievance due to error in evaluating the merits of the grievance," Cruz v. Local

Union No. 3 of Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1153-54 (2d Cir. 1994); see also

Oparaji, 418 F. Supp. 2d at 147 ("Conduct that is irresponsible or grossly negligent but lacks an

improper motive does not constitute a breach of the duty of fair representation." (internal

quotation marks omitted)). And "although a union has a duty to perform some minimal

investigation, only an egregious disregard for union members' rights constitutes a breach of the

union's duty to investigate." Thomas v. Little Flower for Rehab. & Nursing, 793 F. Supp. 2d

544, 548 (E.D.N.Y. 2011) (internal quotation marks and citation omitted); see also Ayazi, 2011

WL 888053, at *11 ("[W]here the union, after a good faith investigation of the merits of a

grievance, concludes that the claim is insubstantial and refuses to encumber further its grievance

channels by continuing to process the unmeritorious claim, its duty of fair representation may

well be satisfied." (quoting Local Union No. 12 United Rubber, Cork, Linoleum & Plastic

Workers of Am. v. NLRB, 368 F.2d 12, 17 (5th Cir. 1966)).

14

b.    *Klaper Has Failed to State a Claim for Breach of the DFR*

Klaper points to five main actions or omissions by Local 74 in support of his DRF claim: (1) Local 74's alleged failure to investigate his termination; (2) Local 74's failure to investigate the Cemetery's alleged breach of the Stipulation by its failure to cover the costs of his alcohol rehabilitation program; (3) Local 74's failure to file a grievance on Klaper's behalf after his three-month suspension; (4) Local 74's alleged failure to take other actions on Klaper's behalf after his suspension; and (5) Local 74's alleged conspiracy with the Cemetery to terminate Klaper. For the reasons that follow, the court finds that each of these claims is either insufficiently pleaded, unsupported by the record, or does not constitute "arbitrary, discriminatory, or [ ] bad faith" conduct. Vaca, 386 U.S. at 190. Thus, Klaper has failed to state a claim for breach of the DFR.

i.    Failure to Investigate Klaper's Termination

First and principally, Klaper argues that "Local 74 . . . failed to make *any* investigation or inquiry with respect to plaintiff's termination." (Pl. Mem. in Supp. of Mot. to Am. Compl. & in Opp'n of Mot. to Dismiss (Docket Entry # 41) ("Pl. MTD Mem.") at 11; see also Pl. Obj. at 4.) This allegation—which Klaper does *not* make in his Amended Complaint—simply has no support in the record. Klaper's own Amended Complaint makes clear that Local 74 took significant actions on Klaper's behalf after finding out about his initial termination.[10] These actions included: meeting with Klaper at least three times about his concerns and telling him that Local 74 would make a decision about his complaint (Am. Compl. ¶¶ 64-65); arranging a meeting between Klaper, his union representatives, and managing employees of the Cemetery (id. ¶¶ 66); providing Klaper with a Polish-language interpreter at the meeting (id. ¶ 67); and,

---

[10]    As discussed below, Local 74 was not required to conduct an *additional* investigation or take further action following Klaper's *second* termination in October 2008. (See Part III.B.2.b.iii-iv, infra.)

most importantly, negotiating the Stipulation with the Cemetery, which gave Klaper an opportunity to gain his job back by successfully completing three months of medical treatment (id. ¶¶ 68-69; Stipulation). These actions preclude a finding that Local 74 failed to conduct "some minimal investigation," nor has Klaper otherwise alleged the kind of "egregious disregard for union members' rights [that] constitutes a breach of the union's duty to investigate."[11] Thomas, 793 F. Supp. 2d at 548.

ii.      Failure to Investigate Breach of the Stipulation

Klaper next argues that Local 74 "fail[ed] to make *any* investigation or inquiry with respect to the Cemetery's breach of the 'Final Chance Stipulation.'" (Pl. MTD Mem. at 11.) He argues that the Cemetery breached the Stipulation by "failing to provide [him] with the agreed to medical benefits to cover [his] stay at the Alcohol Rehabilitation Program." (Id. at 11; see also Pl. Obj. at 8-10.) Klaper alleges that he was required to pay for the costs of the program out of pocket. (Am. Compl. ¶ 75.)

Klaper has not sufficiently alleged that the Cemetery breached the Stipulation because there is nothing in the Amended Complaint to suggest that the Cemetery failed to provide Klaper with the benefits he had under his *existing* benefits plan with the Cemetery, which was all the Stipulation required it to do. (See Stipulation (providing that the "Cemetery will *continue* paying for [Klaper's] benefits during the three month period of suspension" (emphasis added)).[12] If

---

[11]      Thus, Klaper's reliance on Thomas and Moore v. Roadway Express, Inc., No. 07-CV-977 (DLI) (JMA), 2008 WL 819049 (E.D.N.Y. Mar. 22, 2008), is misplaced. (See Pl. Obj. at 5-6.) In those cases, unlike in Klaper's, the union *wholly* failed to investigate the plaintiff's complaint. See Thomas, 793 F. Supp. 2d at 548 (denying motion to dismiss where plaintiff contacted the union on numerous occasions, "the union representatives falsely represented that her grievance was being processed," and the union "failed to make any representation that it did perform an investigation"); Moore, 2008 WL 819049, at *5 (denying motion to dismiss where union "failed to conduct even a minimal investigation").

[12]      Klaper misrepresents the Stipulation when he argues that the "Cemetery agree[d] . . . to pay for the cost of the plaintiff's [Alcohol Rehabilitation] program." (Pl. MTD Mem. at 12.) It agreed only to continue providing Klaper with the benefits it had been providing previously. (See Stipulation.)

16

anything, Dr. Pabis's letter to Russo suggests that Klaper's alcohol treatment program at St. Mark's was *not* covered by his existing plan. (See Am. Compl., Ex. C. (noting that Klaper "covered the cost of the treatment with cash, since his insurance had no contract with this facility").) In any event, Klaper does not allege that he informed Local 74 in 2008 that the Cemetery had breached the Stipulation or had refused to pay for his alcohol treatment program (see id. ¶¶ 95-109), so any failure to investigate such a breach was not "arbitrary, discriminatory, or in bad faith."[13]

### iii.    Failure to File a Grievance

Third, Klaper asserts that Local 74 "arbitrarily refus[ed] to file a grievance subsequent to plaintiff's termination" after his three-month suspension. (Pl. MTD Mem. at 11; see also Pl. Obj. at 8.) The court does not consider this decision to be arbitrary. Under the terms of the Stipulation, Klaper agreed that: (1) he would "show proof of successfully completing the Alcohol Rehabilitation Program"; and (2) he would return to work on October 1, 2008, following successful completion of the program. (Stipulation.) But Klaper indisputably failed to successfully complete the alcohol rehabilitation program, failed to return to work on the scheduled return date, and failed even to notify the Cemetery or Local 74 that he was unable to return that day.[14] (See Am. Compl. ¶¶ 81-82, 93.) In light of Klaper's noncompliance with the Stipulation, Local 74's failure to file a grievance was reasonable; indeed, the NYSDHR found

---

[13]    Klaper also suggests that the Cemetery breached the Stipulation by "failing to respond to plaintiff's doctors' requests for reasonable accomodations" and by "terminating plaintiff while he was continuing with, and before the agreed to completion of the [Alcohol Rehabilitation] Program." (Pl. MTD Mem. at 11; see also Pl. Obj. at 9-10.) Klaper is incorrect; the Stipulation does not contain any provision for accomodations after the three-month suspension, and the "agreed to completion of the" program was on October 1, 2008, the date of completion of the suspension. (See Stipulation.)

[14]    There is no allegation that Klaper was unable to contact the Cemetery or Local 74 either during his stay at the hospital or upon his discharge from the hospital on October 1, 2008.

that "the union *could not* grieve th[e] matter" under these circumstances. (Determination and Order After Investigation at 2 (emphasis added).)

Klaper responds that Local 74 never translated the Stipulation to him and did not explain it to him fully. (See Pl. Obj. at 9.) This is beside the point, however, because Klaper does *not* allege that he did not understand his obligation to successfully complete the alcohol rehabilitation program and return to work on October 1, 2008; the only things he failed to understand, according to his Amended Complaint, were that "he was agreeing to give up his seniority" and that the Stipulation "was a 'final chance stipulation.'" (Am. Compl. ¶ 70; see also Pl. Obj. at 9.) Indeed, Klaper admits that Anna Kubas—a Polish-speaking employee of Local 74—told Klaper "that after a three (3) months suspension he would return to work." (Id. ¶ 69.) As Klaper failed to do so without notifying the Cemetery, Local 74 could have reasonably concluded that Klaper had not fulfilled his commitments under the Stipulation and that therefore the Cemetery had legitimate grounds to terminate him. At worst, such reasoning would have been flawed or unwise, not "so far outside the wide range of reasonableness as to be irrational."[15] Air Line Pilots, 499 U.S. at 67; see also Cruz, 34 F.3d at 1153-54 ("[T]he duty of fair representation is not breached where the union fails to process a meritless grievance, engages in mere negligent conduct, or fails to process a grievance due to error in evaluating the merits of the grievance."); Ayazi, 2011 WL 888053, at *15 ("[T]he union has the discretion to refuse to pursue claims which *it believes* are without merit." (emphasis added)).

                iv.     Failure to Take Other Actions after the Suspension Period

Klaper argues that Local 74 breached its DFR by failing to take other actions during the period immediately following his three-month suspension from the Cemetery. (See Pl. MTD

---

[15] The court also notes that Klaper never complained to Local 74 about the Stipulation, never asked to revise, amend, or vacate it, and never filed a grievance regarding its terms or the circumstances surrounding his signing it.

Mem. at 11-12; Pl. Obj. at 8.) In particular, Klaper alleges that Local 74 failed to respond to the fax sent by Roman Pabis of St. Mark's to the Cemetery and Local 74 (but addressed only to the attention of Russo, not to a Local 74 employee) (Am. Compl. ¶¶ 85-88, Ex. C); failed to respond to two phone messages Dr. Pabis left for Mike Herron (id. ¶¶ 100-01); and told Klaper that "nothing could be done" after Klaper went to Local 74's office to "plead[] for his job back" (id. ¶¶ 102-05).

As discussed above, however, after Klaper failed to successfully complete the alcohol rehabilitation program and return to work on October 1, 2008, Local 74 could reasonably have believed that Klaper's termination was legitimate or that there were inadequate grounds to continue to pursue his claim. Having taken significant action on Klaper's behalf following his initial termination, it was within Local 74's discretion to "conclude that [Klaper's] claim [wa]s insubstantial and refuse to encumber further its grievance channels by continuing to process the unmeritorious claim." Ayazi, 2011 WL 888053, at *11 (quoting United Rubber, 368 F.2d at 17).

v.    Conspiracy to Terminate Klaper

Finally, Klaper attempts to establish Local 74's bad faith by alleging, "[u]pon information and belief," that "the Cemetery and [Local 74] conspired to terminate Plaintiff and replace him [a] younger, non-Polish and non-disabled worker," including by fabricating the warning slips submitted by the Cemetery to the NYSDHR. (Am. Compl. ¶¶ 122, 200-03; see also Pl. Obj. at 8.) Klaper's claims are too vague and conclusory to survive a motion to dismiss.

"Allegations of conspiracy must be pleaded with particularity." Nweke v. Prudential Ins. Co. of Am., 25 F. Supp. 2d 203, 219 (S.D.N.Y. 1998); see also Gilliard v. N.Y. Pub. Library Sys., 597 F. Supp. 1069, 1075 (S.D.N.Y. 1984) (noting the "somewhat stringent pleading requirements of this Circuit when conspiracy is alleged" (internal quotation marks omitted)).

19

Here, Klaper alleges no specific facts regarding Local 74's role in the fabrication of the warning slips or any part of the alleged conspiracy. Indeed, his allegations on this matter are all based "[u]pon information and belief" and are largely directed toward the Cemetery—Local 74 is simply assumed to be a participant. (See, e.g., Am. Compl. ¶¶ 112-22, 200-03.) Klaper may not base his allegations of conspiracy on speculation. See Nweke, 25 F. Supp. 2d at 219.

*  *  *  *  *

For the above reasons, Klaper has not sufficiently alleged that Local 74's conduct toward Klaper was "arbitrary, discriminatory, or in bad faith." Vaca, 386 U.S. at 190. He has therefore failed to state a plausible claim that Local 74 breached its DFR.[16] See id.

### c.  Klaper's "Acquiescence" Theory

Klaper asserts an alternative theory in support of his Title VII and ADA claims: that Local 74 discriminated against him because it "acquiesced in the Cemetery's discriminatory conduct." (Pl. MTD Mem. at 14.) He argues that a union's acquiescence or ratification of an employer's discriminatory conduct operates as a basis for a union's liability *apart* from a breach of the duty of fair representation; in other words, if he can establish acquiescence or ratification

---

[16]     Because the court holds that Klaper has not sufficiently alleged that Local 74 breached its DFR, it need not discuss in detail the second requirement for an employment discrimination claim against a union: that the union's actions were motivated by discriminatory animus. See Oparaji, 418 F. Supp. 2d at 146. The court notes, however, that it finds persuasive Judge Bloom's determination that Klaper has failed to sufficiently allege discriminatory animus. (See R&R at 14.) As Judge Bloom noted, the only allegation Klaper makes with respect to animus is Mike Herron's statement that "everyone has a nickname" in response to Klaper's complaints about being called "Eddie Mouser" and "stary chuj." (Am. Compl. ¶¶ 106-07.) Klaper argues that this one fact is sufficient to allege animus given the time and context (i.e., in direct response to Plaintiff's grievance), relying on several cases in which one or two discriminatory statements were deemed sufficient to establish animus. (Pl. Obj. at 10-11.) But although a single statement or incident may be sufficient to reveal a union's animus in certain cases, Herron's comment— which made no reference to Klaper's national origin—simply does not rise to that level. Cf. Ayazi, 2011 WL 888053, at *24 (finding that "[i]n the absence of remarks or actions based on plaintiff's disability," a union official's single hostile remark was not sufficient to establish animus); Jowers v. Family Dollar Stores, Inc., No. 09-CV-2620 (WHP), 2010 WL 3528978, at *1 (S.D.N.Y. Aug. 16, 2010) (manager's statement that "black people are lazy and incompetent" was insufficient to establish inference of discrimination).

     Klaper also urges the court to allow him to file an affidavit and Second Amended Complaint, incorporating newly discovered evidence that supposedly bolsters his claim of animus. (See Pl. Obj. at 12 & n.4.) Local 74 objects to these additional amendments. (Local 74 Obj. Opp'n at 24-25.) Because the court does not need to reach Klaper's claim of animus in order to dismiss his Amended Complaint, Klaper's request to file an affidavit and Second Amended Complaint is denied as unnecessary.

on the part of Local 74, "he is not required to establish the breach of duty of fair representation as a necessary element" to his Title VII and ADA claims. (Pl. Obj. at 13.) Klaper further argues that his acquiescence theory does not "require a showing that Local 74 was motivated by discriminatory intent." (Id. at 14.)

Klaper's position has some support in case law. Several courts both in and out of this Circuit have suggested that a union's liability can be established based on an acquiescence theory apart from any breach of the union's DFR. See, e.g., Seymore v. Shawver & Sons, Inc., 111 F.3d 794, 798 (10th Cir. 1997) (holding that in light of the facts of the case, the union could "not be held responsible under Title VII for acquiescing in the actions of [the employer]," and then separately rejecting plaintiff's argument that the union breached its DFR), abrogated on other grounds as recognized in Dunlap v. Kan. Dept. of Health & Envir., 127 Fed. Appx. 433, 438 (10th Cir. 2005); Greenier v. Pace, Local No. 1188, 201 F. Supp. 2d 172, 181-82 (D. Me. 2002) (noting that plaintiff's "alternative theories of ADA liability" were "a claim that [the union] deliberately acquiesced in [the employer's] discriminatory conduct" and "a claim for violation of [the union's] duty of fair representation," and that the former theory "d[id] not require a showing that [the union] was motivated by discriminatory intent"); Nweke, 25 F. Supp. 2d at 220 ("A union's breach of the duty of fair representation may render it liable under Title VII, § 1981, or the ADA. *Additionally*, a union's role in ratifying an employer's discriminatory practice could be sufficient to compel a finding of liability against it." (internal citations omitted) (emphasis added)); United States v. City of Buffalo, 457 F. Supp. 612, 639 (W.D.N.Y. 1978) ("Tacit union acquiescence in an employer's discriminatory practices is sufficient to render it liable.").

Despite this authority, the court concludes that an acquiescence or ratification theory does not provide a basis for a union's liability in the absence of a breach of the DFR; in other words,

21

in order to state a claim for employment discrimination against a union, a plaintiff *must* establish that the union breached its DFR. The court comes to this conclusion for two reasons.

First, case law from both the Second Circuit Court of Appeals and district courts in this Circuit overwhelmingly supports the proposition that a breach of the DFR is a necessary element to an employment discrimination claim against a labor organization. See, e.g., McIntyre, 380 Fed. Appx. at 49 ("[I]n order to establish a violation of Title VII or the ADEA by the [union, plaintiff] would have to show, at a minimum, that the union breached its duty of fair representation and that its actions were motivated by discriminatory animus."); Ross v. Commc'n Workers of Am., Local 1110, 100 F.3d 944, 1996 WL 80688, at *1 (2d Cir. Feb. 20, 1996) (unpublished disposition) (agreeing with the union that "any Title VII claim necessarily implicated [the union's] duty of fair representation"); Jackson v. AFSCME Local 196, No. 07-CV-471 (JCH), 2010 WL 1286771, at *4 (D. Conn. Mar. 29, 2010) ("It is undisputed that in order to succeed on a Title VII claim against a union, a plaintiff must make a showing that the defendant breached its duty of fair representation."); Jiggets v. Allied Int'l Union, No. 07-CV-11572 (JSR) (RLE), 2010 WL 2158331, at *3 (S.D.N.Y. Mar. 17, 2010) ("To establish a Title VII or ADA claim concerning union representation, 'it is axiomatic that . . . there must first be a finding that the [union] breached its duty of fair representation.'" (quoting Ross v. Commc'n Workers of Am., Local 1110, No. 91-CV-6367 (LAP), 1995 WL 351462, at *5 (S.D.N.Y. June 9, 1995)); Duttweiller v. Eagle Janitorial, Inc., No. 05-CV-0886 (GTS) (GHL), 2009 WL 1606351, at *17 (N.D.N.Y. June 4, 2009) ("A finding that a union breached its duty of fair representation is essential to the existence of an ADA claim."); Oparaji, 418 F. Supp. 2d at 146 ("To establish a Title VII claim concerning representation by a union of a member's interests, the plaintiff must first demonstrate that the union breached its duty of fair

representation to the member."). The cases relied upon by Klaper do not deal directly with this authority or explain how they came to the conclusion that an acquiescence theory can provide a basis for union liability absent a breach of the DFR.[17]

Second, the court is convinced that the rule embraced by the weight of authority in this Circuit is correct. The cases Klaper cites for his acquiescence theory do not explain exactly what it means to "ratify" or "acquiesce in" an employer's behavior, but these cases suggest that a union may "acquiesce" to an employer's discriminatory conduct simply by failing to take proper action in response to that conduct—what has been called "tacit acquiescence." Buffalo, 457 F. Supp. at 639; see also Greenier, 201 F. Supp. 2d at 182. And if, as Klaper suggests, this "tacit acquiescence" does not need to be "arbitrary discriminatory, or in bad faith"—as does breach of the DFR—then it is hard to imagine any meaningful role for the doctrine of breach of the DFR in employment discrimination cases; any breach of the DFR in the employment discrimination context could also be considered "tacit acquiescence" on the part of the union in the employer's discriminatory conduct. In other words, if Klaper is right, then a union's DFR would be subsumed entirely within its duty not to acquiesce in an employer's discriminatory conduct. In light of the central role that the DFR plays in employment discrimination cases against unions, including in the cases discussing the acquiescence theory, see, e.g., Seymore, 111 F.3d at 798; Greenier, 201 F. Supp. 2d at 181-82; Nweke, 25 F. Supp. 2d at 220, the court does not consider this to be the state of the law.

---

[17]     Indeed, in Nweke—the only recent case in this Circuit that Klaper cites for his position—the court noted that "in order to establish a Title VII claim concerning representation by a union of its member's interests, it is axiomatic that there must first be a finding that the union breached its duty of fair representation," but did not address the relationship between that concept and its previous suggestion that union ratification of a discriminatory practice could provide an independent basis for liability. 25 F. Supp. 2d at 220 (internal quotation marks and alterations omitted)

Indeed, Klaper suggests that he has stated a viable acquiescence theory simply because he alleged that "Local 74 deliberately chose not to process a grievance involving his discrimination claims." (Pl. MTD Mem. at 14-15; see also Pl. Obj. at 15.) This argument is very difficult to reconcile with the line of cases holding that a union is not required to file a grievance that it deems to be meritless. See, e.g., Ayazi, 2011 WL 888053, at *15 ("While tacit acquiescence in an employer's discriminatory practices is sufficient to render it liable . . . , the union has the discretion to refuse to pursue claims which it believes are without merit." (citing Vaca, 386 U.S. at 190)). Similarly, because acquiescence "does not require a showing that [the union] was motivated by discriminatory intent," Greenier, 201 F. Supp. 2d at 182, then if Klaper is correct that acquiescence provides a ground for liability independent of the breach of a DFR, it is difficult to conceive of a meaningful role for the requirement of discriminatory animus, see, e.g., Oparaji, 418 F. Supp. 2d at 146. The court does not believe that the doctrine of union acquiescence renders these well-established doctrines effectively superfluous.

Thus, the court concludes that in order to state a valid employment discrimination claim against a labor organization, the plaintiff must establish, at a minimum, that the union breached its duty of fair representation. A union's tacit acquiescence or ratification certainly *can* serve as a basis for an employment discrimination claim, but only if the plaintiff sufficiently alleges that this acquiescence or ratification was "arbitrary, discriminatory, or in bad faith"—that is, if the acquiescence or ratification *establishes a breach of the union's DFR*. Because Klaper has not sufficiently alleged that Local 74's actions or omissions were "arbitrary, discriminatory, or in bad faith," he has not stated a claim for breach of Local 74's DFR, and his Title VII and ADA claims against Local 74 must be dismissed.

3.     Section 1985 Claim

Klaper also brings a claim against Local 74 pursuant to 42 U.S.C. § 1985(3). (Am.

Compl. ¶¶ 199-206). Because Klaper objected to Judge Bloom's recommendation that this claim

be dismissed, the court reviews it de novo. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).

Section 1985(3) creates a cause of action where "two or more persons in any State or

Territory conspire . . . for the purpose of depriving . . . any person . . . of the equal protection of

the laws, or of equal privileges and immunities under the laws." Klaper alleges that Local 74

conspired with the Cemetery "to terminate [Klaper] and replace him with [a] younger,

non-Polish and non-disabled worker." (Am. Compl. ¶ 202.)   In particular, Klaper alleges that

Local 74 and the Cemetery fabricated false employee warning slips stating that Klaper had been

observed carrying a handgun and saying that he was on his way to murder Nicastro. (See id.

¶¶ 117, 200-01.)

Section 1985(3) "creates no substantive rights but merely 'provides a remedy for

violation of the rights it designates,' and the Supreme Court has held that in light of the

enforcement and conciliation mechanism created by Congress for claims under Title VII, the

'deprivation of a right created by Title VII cannot be the basis for a cause of action under

§ 1985(3)." Sherlock v. Montefiore Med. Ctr., 84 F.3d 522, 527 (2d Cir. 1996) (quoting Great

Am. Fed. Savings & Loan Ass'n v. Novotny, 442 U.S. 366, 372, 378 (1979)); see also Taggart v.

Moody's Investors Serv., Inc., No. 06-CV-3388 (PKC), 2007 WL 2076980, at *6 (S.D.N.Y. July

17, 2007) ("[G]iven that Congress has established a statutory scheme for enforcement of the

substantive rights protected by the ADA, those rights cannot serve as a basis for a section

1985(3) claim."); Graaf v. North Shore Univ. Hosp., 1 F. Supp. 2d 318, 323 (S.D.N.Y. 1998) ("It

is well-settled that plaintiffs cannot bring § 1985 actions based solely on claims of employment

discrimination." (internal quotation marks omitted)); Ladson v. Ultra East Parking Corp., 853 F. Supp. 699, 704 (S.D.N.Y. 1994). Because Klaper's § 1985 claim against Local 74 is premised entirely upon claims of employment discrimination—that is, rights protected by Title VII, the ADA, and the ADEA—this claim must be dismissed.[18]

### 4. State and City Discrimination Claims

Finally, Klaper asserts claims of employment discrimination against Local 74 under the NYSHRL (Am. Compl. ¶¶ 207-09) and the NYCHRL (id. ¶¶ 210-12), which provide rights of action against unlawful employment practices. The NYSHRL contains an election of remedies provision, which states:

> Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages . . . and such other remedies as may be appropriate . . . *unless such person had filed a complaint hereunder or with any local commission on human rights* . . . provided that, where the division has dismissed such complaint on the grounds of administrative convenience, on the grounds of untimeliness, or on the grounds that the election of remedies is annulled, such person shall maintain all rights to bring suit as if no complaint had been filed with the division.

N.Y. Exec. L. § 297(9) (emphasis added). Thus, NYSHRL and NYCHRL claims, "once brought before the NYSDHR, may not be brought again as a plenary action in another court" unless an exception applies.[19] York v. Ass'n of Bar of City of New York, 286 F.3d 122, 127 (2d Cir. 2002).

---

[18]      Klaper argues that, "[i]n the Second Circuit, discrimination based upon a plaintiff's mental disability is sufficient to state a claim under Section 1985" (Pl. MTD Mem. at 18 (citing cases)), but that is not true in the employment discrimination context, where the ADA provides the mechanism for protecting employees from discrimination based on disability, see Taggert, 2007 WL 2076980, at *6. The cases cited by Klaper did not involve employment discrimination claims.

[19]      The NYCHRL contains an election of remedies provision that is nearly identical to that of the NYSHRL. See N.Y.C. Admin. Code § 8-502(a). Thus, with respect to their election of remedies provisions, "discussion of the [NYSHRL] applies equally to the [NYCHRL]." York v. Ass'n of Bar of City of New York, 286 F.3d 122, 127 (2d Cir. 2002).

Klaper's Amended Complaint alleges that he "timely filed a charge of unlawful discrimination with the New York State Division of Human Rights [ ] against both the Cemetery and the Union –Local 74." (Am. Compl. ¶ 8.) Accepting that allegation as true, Judge Bloom recommended that that the court dismiss Klaper's NYSHRL and NYCHRL claims pursuant to their election of remedies provisions. (R&R at 17.) Because Klaper does not object to Judge Bloom's recommendation (see Pl. Obj. at 18-19),[20] the court reviews this recommendation for clear error. See La Torres, 216 F. Supp. 2d at 159; Gesualdi, 2010 WL 985294, at *1. The court finds no clear error in Judge Bloom's recommendation; thus, the court dismisses Klaper's NYSHRL and NYCHRL claims for lack of subject matter jurisdiction.

## IV. CONCLUSION

For the reasons set forth above, Klaper's motion to amend his Complaint is GRANTED. Local 74's motion to dismiss Klaper's ADEA, Title VII, ADA, and 42 U.S.C. § 1985 claims against Local 74 is GRANTED with prejudice. Klaper's NYSHRL and NYCHRL claims against Local 74 are DISMISSED without prejudice for lack of subject matter jurisdiction. This case will proceed solely against Defendant Cypress Hills Cemetery.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
       March 2 6, 2012

NICHOLAS G. GARAUFIS
United States District Judge

---

[20]  Klaper does request that the court consider his NYSHRL and NYCHRL claims if it concludes that he failed to exhaust his claim with the NYSDHR. (See Pl. Obj. at 18-19.) As discussed above, the court draws no such conclusion. (See supra n.7).

27